UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JANICE J. MEBANE,

                    Plaintiff,

      -vs-                    **No. 6:14-CV-06685 (MAT)**
                                         **DECISION AND ORDER**

COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

---

## I.   Introduction

Represented by counsel, Janice J. Mebane ("plaintiff") brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II.  Procedural History

The record reveals that in October 2011, plaintiff (d/o/b March 10, 1972) applied for DIB, alleging an amended onset date of disability of November 1, 2010. After her application was denied, plaintiff requested a hearing, which was held before administrative

law judge Connor O'Brien ("the ALJ") on May 22, 2013. The ALJ issued an unfavorable decision on July 23, 2013. The Appeals Council denied review of that decision and this timely action followed.

### III. Summary of the Evidence

#### A.   Medical Evidence

Medical records indicate that plaintiff carried diagnoses of fibromyalgia, chronic recurrent headaches, obstructive sleep apnea ("OSA"), recurrent sinus infections, diabetes, attention deficit disorder ("ADD"), dysthymic disorder, and obsessive compulsive disorder ("OCD"). She treated primarily for these conditions with Dr. Stacey Walker, Dr. Michelle Steffers, and Nurse Practitioner ("NP") Mary Ellen Alescio at Canandaigua Medical Group ("CMG"). In the course of her treatment at CMG, which spanned the time period from May 2011 through March 2013, she complained primarily of symptoms of widespread pain associated with fibromyalgia, recurrent chronic headaches, and chronic recurrent sinus infections.

Plaintiff was first diagnosed with fibromyalgia in 2001. She treated for that condition through 2007 in Arizona, where she was then living. Treatment notes from CMG span June 2011 through March 2013. Plaintiff routinely complained of widespread pain, recurrent headaches, fatigue, and depressed and irritable mood secondary to her physical symptoms. Although plaintiff's physical examinations did not tend to reveal abnormalities in gait or strength, they were

2

notable for revealing positive trigger point tenderness[1] consistently over many visits. See T. 288 (June 2011); 296 (September 2011); 305 (October 2011); 309 (January 2012); 365 (March 2012); 471 (December 2012); 462 (February 2013); 458 (March 2013).

In March 2011, Dr. Anatole Kleiner, a consulting rheumatologist, wrote in a letter to Dr. Steffers that regarding fibromyalgia, plaintiff had "all the elements of physical deconditioning, impaired sleep and possibly mood disorder." T. 365. Dr. Kleiner emphasized the importance of exercise to plaintiff's treatment regimen, noting that plaintiff's goal was 30 minutes, five times per week of aerobic exercise. He also advised plaintiff to pursue treatment for sleep apnea, "since sleep disturbance can play a major role in propagation of fibromyalgia symptoms." Id.

Plaintiff also frequently complained of recurrent headaches, which occurred on a daily basis and were accompanied by nausea, dizziness, facial pain, light sensitivity, eye twitching, and vision disturbance. Plaintiff reported that when she experienced dizziness associated with a headache, she felt like she would pass out or fall down if she moved too fast. In Dr. Walker's opinion, plaintiff's recurrent headaches were related to her fibromyalgia.

---

[1] Fibromyalgia pain is often associated with tenderness in at least 11 of the 18 "tender" or "trigger" points. See SSR 12-2p, Titles II & XVI: Evaluation of Fibromyalgia (S.S.A. July 25, 2012).

An August 2011 MRI of plaintiff's lumbar spine showed mild degenerative changes in the lumbar spine, with mild impingement on the left L5 nerve root between the lateral recess and neural foramen, at L5-S1. In September 2011, consulting orthopedic physician Dr. John Orsini opined that plaintiff's "pain distribution and severity [were] out of proportion to the findings on the MRI." T. 296. He noted that plaintiff had tried physical therapy, use of a TENS unit, application of heat and cold, and anti-inflammatory medications. She reported that these approaches had not helped and reported pain fluctuating between 5/10 and 10/10. Dr. Orsinski recommended pain management. T. 286.

An October 2011 sleep study revealed that plaintiff suffered from mild obstructive sleep apnea, which resulted in a reduced amount of REM sleep.

**B. Opinion Evidence**

In May 2011, Dr. Harbinder Toor completed a consulting orthopedic examination at the request of the state agency. On physical examination, plaintiff's cervical spine was normal, but her lumbar spine was limited in range of motion and plaintiff had mild trigger points for fibromyalgia in the shoulders. She had trigger points for fibromyalgia in the back bilaterally, as well as in the thigh and hips bilaterally. Dr. Toor opined that plaintiff was moderately limited in standing, walking, bending, and lifting; moderately limited in sitting for prolonged periods; and mildly to

moderately limited in reaching, pushing, and pulling. According to Dr. Toor, "pain from fibromyalgia interfere[d] with her daily physical routine" and "headache can interfere with her routine." T. 437.

NP Alescio completed a physical residual functional capacity ("RFC") questionnaire in February 2012. She stated that she had been involved in plaintiff's treatment since June 2011, when plaintiff treated with Dr. Walker at Canandaigua Medical Group. Dr. Alescio stated that plaintiff's fibromyalgia manifested through symptoms including positive trigger points and fatigue, and that she also suffered from sleep apnea, a mild disc herniation at L5-S1, and depression. In NP Alescio's opinion, plaintiff's experience of pain or other symptoms would be severe enough to interfere with the attention and concentration necessary to perform even simple work tasks, on a constant basis. According to NP Alescio, plaintiff was incapable of even "low stress" jobs, and her pain worsened with stress.

NP Alescio opined that plaintiff could sit for no more than one hour at a time; stand for no more than 20 minutes at a time; sit, stand, and/or walk for less than two hours in an eight-hour workday; must walk for three minutes every 60 minutes in an eight-hour workday; and would need a job that would permit shifting positions, at will, between sitting, standing, or walking. She would need to take unscheduled breaks approximately every

30 minutes, and would have to rest for at least 15 minutes before returning to work. She could lift less than ten pounds, and only rarely; occasionally look down with her neck or look up; frequently turn her head to the left or right and hold her head in a static position; rarely twist, stoop, crouch, squat, and climb ladders; and occasionally climb stairs. According to NP Alescio, plaintiff's condition would cause her to miss more than four days of work per month.

Psychologist Dr. Yu-Ying Lin completed a consulting psychiatric examination, at the request of the state agency, in February 2012. Dr. Lin noted that plaintiff "appeared to be in pain when she was walking and when she was trying to get up from the chair." T. 336. On mental status examination, plaintiff demonstrated a depressed affect; dysthymic mood; moderately impaired recent and remote memory skills "which may be due to emotional distress secondary to her pain"; and average cognitive functioning. In Dr. Lin's opinion, plaintiff could follow and understand simple directions and instructions, perform tasks independently, maintain attention and concentration, make appropriate decisions, and relate adequately with others. However, plaintiff could not maintain a regular schedule, could not learn new tasks, could not perform complex tasks and needed supervision, and could not "appropriately deal with stress." T. 338. Dr. Lin opined that plaintiff's "difficulties appear[ed] to be caused by

fatigue and distractibility." Id. Dr. Lin also stated that plaintiff's "stress-related problems . . . may significantly interfere with the claimant's ability to function on a daily basis." Id.

Dr. Elizama Montalvo completed a consulting internal medicine examination, at the request of the state agency, in February 2012. On physical examination, plaintiff demonstrated a slow gait which appeared aggravated by pain. Range of motion of plaintiff's cervical and lumbar spine was limited. Dr. Montalvo recorded "14 trigger points on her back, arms, chest, and frontal aspect of the hips." T. 343. In Dr. Montalvo's opinion, plaintiff had "mild to moderate limitation on handling objects, lifting, bending, carrying, kneeling, reaching, standing, sitting, and walking." Id.

Dr. R. Altmansberger reviewed plaintiff's record and completed a psychiatric review technique and mental RFC in March 2012. He opined that she "retain[ed] the ability to perform at least simple and some complex tasks in a low contact setting on a consistent and sustained basis." T. 361.

## IV.  The ALJ's Decision

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. At step one, the ALJ

determined that plaintiff had not engaged in substantial gainful activity since November 1, 2010, the amended alleged onset date. At step two, the ALJ found that plaintiff suffered from the following severe impairments: fibromyalgia with chronic low back pain, chronic recurrent headaches, OSA, recurrent sinus infections, diabetes, ADD, dysthymic disorder, and OCD. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Regarding mental health impairments, the ALJ determined that plaintiff had mild restrictions in ADLs, "no more than moderate" difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace.

Before proceeding to step four, the ALJ determined that, considering all of plaintiff's impairments, plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she required a sit/stand option that allowed her to change positions every 60 minutes for up to five minutes at a time; she could not climb a rope, ladder, or scaffold, but could occasionally stoop, crouch, balance, climb stairs, kneel, and crawl; she could tolerate moderate noise; she could tolerate up to occasional exposure to extreme cold, extreme heat, wetness, humidity, airborne irritants or allergens, and hazards; she could tolerate occasional changes in the work setting; she could not perform a machine driven hourly production rate; she could tolerate

occasional interactions with the public, and no teamwork with coworkers; she needed up to three unscheduled less than five minute breaks; and she could occasionally reach overhead, bilaterally.

After finding that plaintiff could not perform any past relevant work, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which plaintiff could perform. Accordingly, he found that plaintiff was not disabled.

## V.   Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Plaintiff contends that the ALJ's RFC finding was erroneous as to both exertional and nonexertional limitations.

### A.   Nonexertional Limitations

Plaintiff's primary argument, regarding nonexertional limitations, is that the ALJ erred to adequately account for the nonexertional limitations which would be imposed by plaintiff's chronic headaches, chronic fatigue, and pain associated with

fibromyalgia. Plaintiff points to the medical record, which reveals evidence of these complaints and findings on physical examination; NP Alescio's RFC assessment; and the findings of the consulting examiners. After a thorough review of this record and the ALJ's decision, the Court concludes that the ALJ's RFC assessment did not adequately account for plaintiff's nonexertional limitations.

### 1.   Consideration Given to NP Alescio's Opinion

The ALJ rejected NP Alescio's RFC assessment, noting that she was a nurse practitioner – an "other source," not an "acceptable medical source" under the regulations, see 20 C.F.R. § 404.1513 – and reasoning that her opinion was "inconsistent with the claimant continued normal gait [*sic*], positive response to treatment, and few signs on exam throughout the relevant period." T. 33. The ALJ also concluded that plaintiff had "often changed her treatment and/or stopped taking medications," and that her "non-compliance impede[d] an accurate assessment of her limitations." Id. "Finally," the ALJ reasoned, "[plaintiff's] reported activities, including caring for her daughter, teaching a church class, handling her own personal care tasks, and doing some chores, are inconsistent with the extreme limitations assigned by [NP] Alescio." Id.

"[A]lthough a nurse practitioner's opinion is not entitled to the same weight as a treating physician, these opinions are entitled to 'some extra consideration,' when the nurse practitioner

has a treating relationship with the patient." <u>Beckers v. Colvin</u>, 38 F. Supp. 3d 362, 371 (W.D.N.Y. 2014). Here, NP Alescio had a treatment relationship with plaintiff, which was associated with plaintiff's longitudinal treatment at CMG, where plaintiff was also treated by Drs. Walker and Steffers. It is clear from plaintiff's treatment notes, many of which were signed by NP Alescio, that NP Alescio was familiar with plaintiff's condition and treatment. NP Alescio's opinion was thus entitled to some extra consideration, as noted above.

The ALJ's consideration of NP Alescio's opinion, however, was unsupported by substantial evidence. First, while the ALJ reasoned that NP Alescio's opinion was inconsistent with other substantial record evidence, a review of the record shows that it was not. Although plaintiff did sometimes demonstrate a "normal gait," as the ALJ pointed out, she was actually noted to have an slow or antalgic gait on multiple occasions throughout the record. In fact, two of the state agency's own consulting sources noted that plaintiff demonstrated an abnormal gait. Consulting psychologist Dr. Lin noted that plaintiff "appeared to be in pain when she was walking and when she was trying to get up from the chair," T. 336, and consulting physician Dr. Montalvo noted on physical examination that plaintiff demonstrated a slow gait which appeared aggravated by pain.

As for the ALJ's reasoning that plaintiff demonstrated a "positive response to treatment," it is unclear what evidence she referred to in support of that statement. The record establishes that plaintiff's condition had not improved, and that she continued to report pain associated with fibromyalgia and recurrent headaches for the entire time period covered by the treatment notes in this record. As of late 2012 and early 2013, plaintiff's physical examinations continued to reveal positive trigger points for fibromyalgia. The record does not support the ALJ's conclusion that plaintiff experienced any meaningful positive response to treatment.

The ALJ's reasoning that plaintiff demonstrated "few signs on exam throughout the relevant period" is similarly inconsistent with substantial evidence in the medical record. First, as discussed above, plaintiff's physical examinations consistently showed positive trigger point tenderness for fibromyalgia. These findings, in combination with plaintiff's continued complaints of widespread pain, headaches, and fatigue, demonstrated that plaintiff's fibromyalgia was a severe impairment, as the ALJ found. However, it is apparent from the ALJ's discussion of this evidence that he did not properly consider plaintiff's condition as required by the Administration in SSR 12-2p, which addresses consideration of fibromyalgia. See Mnich v. Colvin, 2015 WL 7769236, *19 (N.D.N.Y. Sept. 8, 2015), report and recommendation adopted, 2015 WL 7776924

(N.D.N.Y. Dec. 2, 2015) (remanding for compliance with SSR 12-2p, noting that "fibromyalgia does not always result in objective findings or diagnostic tests"). Although plaintiff's physical examinations were sometimes normal, and the findings of her lumbar spine MRI were mild, the record reveals several treating sources who positively diagnosed her with fibromyalgia. Indeed, Dr. Kleiner opined that plaintiff had "all the elements of physical deconditioning, impaired sleep and possibly mood disorder," associated with fibromyalgia. T. 365.

The ALJ's statement that plaintiff "often changed her treatment and/or stopped taking medications," and that her "non-compliance impede[d] an accurate assessment of her limitations," was also not an accurate representation of the substantial evidence of record. T. 33. Although the record does reveal isolated instances in which plaintiff stopped taking certain medications, treatment notes indicate that plaintiff reported ceasing these medications primarily because certain side effects from the medicine were causing her more pain and discomfort. Moreover, plaintiff never completely ceased taking prescribed medications. In September 2011, plaintiff reported ceasing taking Effexor for approximately one week to see if it was helping her pain, but stated that she did not notice a difference. At that time, plaintiff was also taking two other prescription pain medications. In November 2011, plaintiff reported ceasing taking Savella, which

was prescribed for her fibromyalgia, "because it started to give her [a] very severe [headache]." T. 308. Plaintiff continued to take her other prescribed medications, which included two for pain management and one for depression. Overall, the record reflects that the medications plaintiff ceased taking had been prescribed on an as needed basis, and plaintiff continued to work with her doctors in order to manage her medications in a way that most effectively addressed her symptoms. There is no indication in the record that any physician believed that plaintiff's isolated instances of stopping medication, which significantly were accompanied by feedback to her doctors regarding which medications she believed were working to help her symptoms, "impede[d] an accurate assessment of her limitations," as the ALJ found.

Finally, the ALJ's assessment of plaintiff's ADLs does not find support in the record. Plaintiff reported the ability to do various ADLs, but with many exceptions. Plaintiff reported that she could perform various household chores, including cooking, but only as her back pain allowed. She reported that her husband and thirteen-year-old daughter helped her whenever necessary. She reported that she could drive, but not after taking pain medication. She stated that she needed help grocery shopping due to her symptoms. She also reported that her symptoms of widespread pain had caused her to give up all of her hobbies with the exception of attending church on Wednesdays and Sundays, even with

14

her discomfort.  Moreover, plaintiff reported that she tried to walk regularly for exercise, and in the past had walked as much as a mile at a time. These ADLs, however, did not, as the ALJ apparently found, "translate[] into the ability to perform substantial gainful work . . . in a typical competitive workplace environment." Miller v. Colvin, No. 2015 WL 4892618, *5 (W.D.N.Y. Aug. 17, 2015). Moreover, plaintiff's reports of attempted exercise actually appear to reflect her own efforts to comply with treatment goals.

Thus, although the ALJ was not required to give NP Alescio's opinion controlling weight, it is clear from this record that her opinion was entitled to more than the little weight given by the ALJ. "[A] nurse practitioner is qualified to present evidence with respect to the severity of a claimant's impairments and the effect of those impairments on a claimant's ability to work." Vongsouvanh v. Comm'r of Soc. Sec., 2015 WL 926200, *9 (N.D.N.Y. Mar. 3, 2015) (citing SSR 06-3p). Here, NP Alescio's opinion was the only opinion, from a longitudinal treating source, regarding plaintiff's work-related functional limitations. The ALJ's reasons for giving the opinion little weight were not supported by substantial evidence. Moreover, as discussed below, the consulting opinions did not provide substantial evidence for the nonexertional limitations found in the ALJ's RFC determination. Under these circumstances, NP Alescio's opinion is entitled to greater consideration. See, e.g.,

Gillies v. Astrue, 2009 WL 1161500, *6 (W.D.N.Y. Apr. 29, 2009)
("While the ALJ need not have given [the nurse practitioner]'s
opinion the same weight as the opinion of the [consulting]
physician, the ALJ should have given [the] treatment report greater
consideration than she did.") (citing Monger v. Heckler, 722 F.2d
1033, 1039 n.2 (2d Cir. 1983) (while the opinion of a nurse is not
entitled to the same weight as the opinion of a treating physician,
such an opinion is "entitled to some extra consideration ...")).

### 2. Consideration Given to Consulting Opinions and Medical Evidence of Record

Significant findings by the consulting medical sources also
indicate that the ALJ's RFC assessment was not supported by
substantial evidence. As noted above, the ALJ found the following
nonexertional impairments: she could tolerate moderate noise; she
could tolerate up to occasional exposure to extreme cold, extreme
heat, wetness, humidity, airborne irritants or allergens, and
hazards; she could tolerate occasional changes in the work setting;
she could not perform a machine driven hourly production rate; she
could tolerate occasional interactions with the public, and no
teamwork with coworkers; and she needed up to three unscheduled
less than five minute breaks.

Two out of three consulting sources, Drs. Toor and Lin, found
that plaintiff's conditions would interfere with her daily
functioning. According to Dr. Toor, "pain from fibromyalgia
interfere[d] with her daily physical routine" and "headache can

16

interfere with her routine." T. 437. According to Dr. Lin, plaintiff could not maintain a regular schedule, could not learn new tasks, could not perform complex tasks and needed supervision, and could not "appropriately deal with stress." T. 336. Dr. Lin opined that plaintiff's "difficulties appear[ed] to be caused by fatigue and distractibility," and her "stress-related problems . . . may *significantly* interfere with [her] ability to function on a daily basis." Id. (emphasis added).

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. § 404.1545 . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Soc. Sec. Ruling ("SSR") 96-8p, 933 F.Supp. 303, 1996 WL 374174, *1 (July 2, 1996). As discussed below, the ALJ's decision does not reflect a proper explanation of how the evidence relates to the specific functional limitations that he found.

It is not clear from the record how the ALJ's findings regarding nonexertional limitations related to the findings of Drs. Toor and Lin, although the ALJ gave both opinions "some" weight. See T. 32-33. First, regarding plaintiff's headaches, the record reflects that she reported that this condition was associated with symptoms of nausea, dizziness, facial pain, light

17

sensitivity, eye twitching, and vision disturbance. Plaintiff reported that when she had dizziness associated with a headache, if she moved too fast she felt like she would pass out or fall down. The ALJ's findings that plaintiff could not tolerate more than moderate noise, nor certain environmental irritants, were apparently designed to account for headache-related limitations. However, these findings do not logically address limitations that would be associated with the nausea, vision disturbance, and dizziness plaintiff reported was associated with her headaches. Notably, there is no evidence in the record contradicting that plaintiff experienced these symptoms. The only statement by an acceptable medical source as to headache-related limitations came from Dr. Toor, who opined that headaches "could interfere with her routine." T. 437. Considering this record, and the fact that Dr. Toor's statement is not contradicted by the record, the Court finds that the ALJ's RFC finding did not adequately account for limitations stemming from plaintiff's chronic headaches.

Second, the ALJ's decision does not adequately explain how the RFC determination accounted for nonexertional limitations experienced by plaintiff secondary to her fibromyalgia symptoms. The record is replete with reference to plaintiff's widespread pain, which was consistently accompanied by positive trigger point tenderness, fatigue, and depressed and irritable mood. Both Drs. Toor and Lin found that these symptoms, which were associated

18

with fibromyalgia, would interfere with plaintiff's daily routine. These symptoms would interfere not only from a physical standpoint, but from a mental standpoint as opined by Dr. Lin, who stated that plaintiff's "fatigue and distractibility" caused an inability to maintain a regular schedule, and stress-related problems limited her ability to function on a daily basis. T. 336.

The ALJ apparently attempted to account for these limitations by finding that plaintiff could tolerate occasional changes in the work setting; she could not perform a machine driven hourly production rate; she could tolerate occasional interactions with the public, and no teamwork with coworkers; and she needed up to three unscheduled less than five minute breaks. It is entirely unclear, however, how the ALJ determined that plaintiff's medically determinable impairments resulted in these specific limitations.

Notably, in response to a hypothetical question, the vocational expert ("VE") testified that a plaintiff requiring an additional three breaks of 20 minutes each, or a plaintiff who would be off-task 20 percent of the workday or absent more than two times per month, would be unable to perform any jobs in the national economy. The ALJ failed to explain, however, why she decided that the less restrictive findings in the RFC were consistent with substantial record evidence, while the more restrictive findings were not. It appears that the ALJ simply made an RFC determination which was consistent with a finding of non-

disability, rather than explaining what evidence supported his RFC findings as to nonexertional limitations. See Nix v. Astrue, 2009 WL 3429616, *6 (W.D.N.Y. Oct. 22, 2009) (noting that "an ALJ cannot pick and choose only parts of a medical opinion that support his determination," and "may not ignore an entire line of evidence that is contrary to [his] findings") (internal quotation marks omitted); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims.") (citing Lopez v. Sec'y of Dept. of Health and Human Services, 728 F.2d 148, 150-51 (2d Cir. 1984)). The ALJ's failure to provide such an explanation was error.

Finally, the ALJ's RFC finding does not adequately account for plaintiff's stress-related limitations. "Because stress is highly individualized, mentally impaired individuals may have difficulty meeting the requirements of even so-called low-stress jobs, and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work." Stadler v. Barnhart, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (internal quotation marks omitted) (citing SSR 85-15); Welch v. Chater, 923 F. Supp. 17, 21 (W.D.N.Y. 1996) ("Although a particular job may appear to involve

little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments").

In this case, there is ample record evidence indicating that plaintiff experienced stress associated with the pain and fatigue that resulted from her fibromyalgia. Dr. Lin, to whose opinion the ALJ gave "some" weight, opined that plaintiff could not appropriately deal with stress. He also reiterated that plaintiff's stress-related problems may "significantly" interfere with her ability to function on a daily basis. There is no evidence in the medical record to contradict these findings by Dr. Lin. Additionally, NP Alescio's opinion, which found that plaintiff could not handle even low stress jobs, supports Dr. Lin's conclusion. The ALJ's RFC finding failed to adequately account for these stress-related limitations, because it reflected no individualized assessment of plaintiff's limitations as pertaining to stress. See Lancellotta v. Sec'y of Health and Human Servs., 806 F.2d 284, 285 (1st Cir. 1986) (reversing and remanding where "[t]he ALJ made no findings on the nature of [plaintiff]'s stress, the circumstances that trigger it, or how those factors affect his ability to work"); Smith v. Astrue, 2011 WL 6739509, *7 (N.D.N.Y. Nov. 4, 2011) ("The ALJ did not make sufficient findings concerning [p]laintiff's particularized ability to deal with stress, other than to generically conclude that she was limited to 'low stress' work."); cf. Davis v. Comm'r, Soc. Sec. Admin., 2013 WL 1124589, *3

(D. Md. Mar. 18, 2013) (holding that RFC finding specifying "low stress" was adequate only because this term had been sufficiently described to the VE when presenting a hypothetical).

In summary, the ALJ's RFC finding failed to adequately account for plaintiff's nonexertional limitations. The record established significant nonexertional limitations, which were opined by both plaintiff's treating nurse practitioner and two out of three consulting physicians. However, the ALJ's decision did not adequately incorporate those findings. The RFC determination was therefore unsupported by substantial evidence and did not satisfy the mandate of SSR 96-8p, which requires that an RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. This matter is thus remanded for further proceedings, with the instructions provided below.

**B.    Exertional Limitations**

Plaintiff also contends that the ALJ erroneously assessed her exertional limitations. The ALJ included the following exertional limitations in his RFC finding: plaintiff required a sit/stand option that allowed her to change positions every 60 minutes for up to five minutes at a time; she could not climb a rope, ladder, or scaffold, but could occasionally stoop, crouch, balance, climb stairs, kneel, and crawl; and she could occasionally reach overhead, bilaterally. These limitations were apparently based on

22

the physical restrictions found by Drs. Toor and Montalvo, which opinions the ALJ gave "some" weight. As noted above, Dr. Toor found that plaintiff was moderately limited in standing, walking, bending, and lifting; moderately limited in sitting for prolonged periods; and mildly to moderately limited in reaching, pushing, and pulling. Dr. Montalvo found that plaintiff had "mild to moderate limitation on handling objects, lifting, bending, carrying, kneeling, reaching, standing, sitting, and walking." T. 340.

Because this case is remanded, in part, for reconsideration of the weight to be given to NP Alescio's opinion, which contained much more significant physical restrictions, the ALJ is directed, on remand, to reconsider plaintiff's physical RFC.[2] The Court notes that the ALJ may, in compliance with the instructions outlined below, obtain an opinion from a treating source as to the functional limitations resulting from plaintiff's fibromyalgia and other medically determinable impairments, and consider it in reaching her ultimate RFC physical determination.

## VI.  Instructions on Remand

On remand, the ALJ is directed to reconsider NP Alescio's opinion, consistent with this Decision and Order. The ALJ should consider the weight to be given to NP Alescio's opinion with specific reference to the medical evidence, stating whether the

---

[2] The Court notes that the same analysis regarding the weight to be given to NP Alescio's opinion as to nonexertional limitations applies to a consideration of the weight to be given to her opinion as to plaintiff's exertional limitations.

evidence either supports or contradicts NP Alescio's opinion, keeping in mind that the reasons stated for rejecting NP Alescio's opinion in the original decision were unsupported by substantial evidence. The ALJ should specifically consider whether NP Alescio's opinion is entitled to significant weight in this case, although it is not entitled to the controlling weight of a treating physician. See, e.g., Davis v. Colvin, 2016 WL 368009, *4 (W.D.N.Y. Feb. 1, 2016) (remanding where ALJ failed to properly consider "other source" opinion from chiropractor, noting that the opinion may be entitled to significant weight "considering the longtime treatment relationship he has with plaintiff, and may be due more weight if it is consistent with other substantial evidence in the record") (citing Monette v. Astrue, 269 Fed. App'x 109, 113 (2d Cir. 2008) (noting that a chiropractor's "other source" opinion may be given "significant weight in appropriate circumstances")).

The ALJ is specifically instructed to properly evaluate plaintiff's RFC in connection with the substantial evidence of record. If the ALJ determines that it would be helpful to a proper determination of plaintiff's RFC, the ALJ may request opinions from plaintiff's treating physicians as to the combined effect of plaintiff's physical and mental limitations stemming from her medically determinable impairments.

The Court notes that in this case, nonexertional and exertional limitations are demonstrably intertwined. First, the

24

diagnosis of fibromyalgia often involves the presence of nonexertional criteria, such as symptoms of a mood disorder, which Dr. Kleiner opined that plaintiff had. See SSR 12-2p (describing diagnosis of fibromyalgia under two sets of diagnostic criteria). Second, as evidenced by treatment notes as well as the opinions of NP Alescio and Dr. Lin, plaintiff's physical symptoms of pain and fatigue caused limitations in her ability to maintain a regular schedule. Even non-examining consulting source Dr. Altmansberger found that plaintiff had moderate limitations in performing activities within a regular schedule, maintaining regular attendance, and being punctual within customary tolerances. On remand, the ALJ is directed to fully consider plaintiff's limitations with an understanding that her nonexertional limitations may actually stem from her exertional limitations.

Finally, on remand, the ALJ is directed to specifically explain how the functional limitations contained within the RFC finding are supported by the evidence, in a function-by-function assessment as required by the regulations, see 20 C.F.R. § 404.1545, "with the understanding that fibromyalgia does not always result in objective findings or diagnostic tests." Mnich, 2015 WL 7769236, at *19.

## VII. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 7) is denied and plaintiff's motion

(Doc. 6) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


                                        **S/Michael A. Telesca**
                                        _____
                                        HON. MICHAEL A. TELESCA
                                        United States District Judge

Dated:      February 10, 2016
            Rochester, New York.